Hans F. Wriedt v. Commissioner.
Wriedt v. Commissioner
Docket Nos. 8731, 8732.
United States Tax Court
1947 Tax Ct. Memo LEXIS 305; 6 T.C.M. (CCH) 144; T.C.M. (RIA) 47036; February 18, 1947
*305 Held, petitioner was a resident alien during the taxable year and correctly returned his income as such. W. H. Harris, Esq., Fort Valley, Ga., for the petitioner. F. L. Van Haaften, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion In Docket No. 8731 the respondent determined a deficiency of $1,980.77 for the period May 10, 1940 to December 31, 1940, together with a penalty for delinquency of $495.19 and a penalty for negligence of $99.04. The deficiency and penalties were determined against the petitioner as withholding agent for Hard, A. G. It was held that Hard, A. G., a foreign corporation, realized income in the taxable period and that petitioner was liable as withholding agent for payment of tax on such income. In Docket No. 8732 the respondent determined *306 the same deficiency and penalties against petitioner as an individual, holding that for the period May 10, 1940 to December 31, 1940, petitioner was a nonresident alien and that since he did not file a return as a nonresident alien the penalties attached. Findings of Fact Prior to November 1935 the petitioner lived in Germany. Until 1932 he was general manager of Nordsee Deutsche Hochseefischerei, which company he had built up from a small beginning. The company owned a large fishing fleet and was the first agency to "quick freeze" fish. Eighteen days after Hitler came to power on April 1, 1933, petitioner was placed in jail, where he remained for 92 days, thereafter being released under observation by the Gestapo. He was required to report to the police each day. His passport was taken away and he lived with his mother-in-law in Bavaria. For a long time the petitioner had had faith in the economic possibilities of the United States and had invested a large sum of money in this country. Even before Hitler came to power, petitioner had transferred money into Switzerland, sending the same to Fides Union Fiduciaire, a trust company in Zurich. At this time petitioner's funds amounted *307 to more than one-half million dollars. All of the money sent to Fides Union Fiduciaries belonged to petitioner in his own right. Because of the rise of the Hitler movement it was not safe to carry securities in his own name, hence petitioner, at the suggestion of Fides Union Fiduciaire, bought the charter of a Swiss corporation known as Hard, A. G. Petitioner was afraid that if it was found out that he had funds abroad his relatives would be killed. Hard, A. G., never had any money of its own, petitioner being the owner of all its assets. Petitioner owned all the stock of Hard, A. G., and Max Kaiser was its only officer. An account was also maintained at Bankers Trust Company in New York in the name of Hard, A. G. While under observation by the Gestapo, on November 10, 1935, petitioner and his wife visited a club in Bremen, where one of petitioner's lawyers came to him and told him the Gestapo had a warrant for him and that he should leave the country at once. After finishing dinner, petitioner and his wife left at once by automobile, going toward the Dutch Border. Petitioner successfully evaded the police and arrived in Holland, where he stayed two days, going thence to Switzerland *308 where he remained until April 1936. Upon learning from a Swiss lawyer that a warrant for petitioner for high treason had been issued, in April 1936 petitioner went to England. The petitioner bought a home in England and his father joined him there. His father died at petitioner's home in England in 1938. Previous to coming to the United States in 1939 the petitioner had made frequent visits to the United States and Canada, where he was interested in a gold mining development. For these visits he had in hand a temporary visa. In August 1939 the petitioner was advised by friends, who were officials in London of the Bankers Trust Company and Central Hanover Bank and Trust Company of New York, that he should leave England for his own protection; that war was coming soon; and that although they knew him to be anti-Hitler, it was not known to the people in the street. Using his temporary visa, petitioner came to the United States with his family, arriving September 1, 1939. At this time petitioner had in the Bankers Trust Company $20,000 together with various securities, the securities being held in the name of Hard, A. G. Before leaving London he also had drawn [*] 500 through the *309 London branch of the Central Hanover Bank. Petitioner, immediately after arriving in the United States, told his wife that they would attempt to get an immigration visa and stay in the United States permanently. Early in October 1939 plans were made for petitioner to go to Cuba to perfect re-entry into the United States on an immigration visa. This plan was abandoned because no visas were available on account of the war. Sometime in the fall of 1939, petitioner went to Delray Beach, Florida. He bought a lot and secured a FHA loan to build a house which has been his home to date. While living in Delray Beach petitioner has made contributions to church and charitable agencies and has taken his place as a citizen of the community. On May 10, 1940, desiring to secure from the Bankers Trust Company the securities held by it in the name of Hard, A. G., the petitioner wrote the Trust Company authorizing them to deliver the securities to "Hans F. Wriedt, as agent for Hard, A. G." The bank accordingly released the securities and turned them over to the petitioner. Prior to the petitioner's request for delivery of the securities by Bankers Trust Company, Max Kaiser, representing Hard, A. *310 G., in which name the securities were held, at petitioner's instruction, had written the Bankers Trust Company that whenever petitioner requested same, the securities were to be delivered to him. After petitioner had received the securities from the Bankers Trust Company he wrote to Max Kaiser and informed him of that fact and that there was no further use to keep Hard, A. G., alive. He accordingly directed Kaiser to dissolve Hard, A. G., which was done some time in 1941, the stock certificates being cancelled. Prior to May 10, 1940, the Bankers Trust Company had filed withholding tax returns and paid withholding tax on the income received from the securities in its hands. The petitioner timely filed his income tax return for the calendar year 1940 in which he disclosed that he considered himself a resident alien. On August 22, 1941, petitioner filed an amended return for the calendar year 1940, in which he reported an item of $30.42, the same being a dividend from a Canadian corporation which had been credited to petitioner without his knowledge but not remitted to him. In his original return petitioner reported dividends amounting to $11,974.24 received entirely from 37 American *311 corporations. He also reported net long-term capital losses amounting to $3,838.13, all resulting from sales of stock in American corporations. He claimed credits for two dependent children, aged 12 years. On June 4, 1943, petitioner filed a claim for refund in the amount of $55.26. The petitioner's first visitor's visa expired in October 1939. He was given a temporary stay until May 1941. He remained in the United States on temporary visitor's visas thereafter until March 27, 1943, when he went to Canada and obtained an immigration visa dated April 1, 1943, on which he returned to the United States as an immigrant. Promptly after returning from Canada in 1943, the petitioner filed his first papers applying for citizenship. At the time of the hearing before this Court sufficient time had not elapsed to permit the petitioner to make application for his final papers. Hard, A. G., a Swiss corporation, at all times was entirely owned by petitioner. After May 10, 1940, when the securities were turned over to the petitioner, he held them in his own right. During the taxable year petitioner was a resident alien of the United States. Opinion VAN FOSSAN, Judge: In Docket 8732 the *312 respondent contends that the petitioner, in the taxable period May 10, 1940 to December 31, 1940, was a nonresident alien. Petitioner maintains that in filing his return for the calendar year 1940 he properly classified himself as a resident alien. The case turns on the facts. A reading of the pertinent regulations and Bureau interpretations set out below [1] with the present facts appropriately inserted in the several defining elements, leaves no doubt in our minds as to the correct answer to the problem. *313 The petitioner fits, with glove-like nicety, into the respondent's own definitions of a resident alien, particularly the provisions relating to the recent emergency with its "exceptional circumstances." Paralleling the tests laid down by the respondent with the facts in the instant case, we find that petitioner, who had been forced to flee Germany and desired to get away from the threat of war in Great Britain, came to the United States, using a temporary visitor's visa previously issued. Petitioner and his family, consisting of his wife and two minor children arrived in the United States in September 1939. Upon arriving in the United States petitioner immediately declared to his wife that he intended to stay permanently in the United States. Numerous extensions of his temporary visa were applied for and granted. Plans were laid for attempting to obtain an immigration visa by going to Cuba and returning to the United States. His tax return shows that he had large investments in securities in the United States which were, at the beginning of the taxable period as determined by the respondent, transferred to him personally. All of his income, with one negligible minor exception, *314 was derived from dividends received from investments in some 37 American companies and his net long-term capital losses resulted exclusively from sales of stock in American corporations. Promptly on coming to this country the petitioner bought a lot in Delray Beach, Florida, and, after obtaining a FHA loan, erected a house which has served as his home from that day to the present. Conforming to the intention expressed shortly after arrival in this country to become an American citizen, petitioner, in 1943, went to Canada and obtained an immigration visa for re-entry into the United States. After returning from Canada the petitioner filed his first papers applying for citizenship. Summarizing, that this is a case in which there were "exceptional circumstances" is patent. Likewise, it may with entire accuracy be stated that from the date of his arrival in the United States to the present time, almost every affirmative act of petitioner indicates or confirms his intention to become an American citizen at the earliest possible date. The respondent's argument that petitioner should be classified as a nonresident alien fails to carry conviction. For example, in his brief he states: *315 * * * There was apparently no prohibition upon his returning to England or even returning to Germany. He was a German citizen and we were not at war with Germany. The evidence shows that he was informed by his Swiss lawyer that charges of high treason had been placed against him, which presumably caused him to refrain from returning to Germany, but these reasons do not appear to have come out of the war or any conditions incident to the war. Under his own statement it would appear that his leaving was due more to local internal conditions within his home country. His leaving was not that of a refugee whose country had been overrun by any enemy and the inhabitants forced to flee to safety in a country not of their own choosing and merely going any place for refuge. Again the respondent says, "When petitioner allegedly fled from England, England was not then at war with Germany. He was not being mistreated." It is difficult to imagine more impelling reasons for fleeing Germany than those which appear in the facts. Likewise, he had a wholly valid and compelling reason for leaving England. The weakness of respondent's position is apparent on a mere statement of his argument. This *316 is a case in which the impression made by the petitioner at the hearing is worthy of note. The earnest recital of his experiences in Germany and the obvious sincerity of his determination to make America his home are facts fully apparent only to one who heard his testimony. They are, nevertheless, facts of importance in testing the intention of the petitioner. We conclude that the petitioner, during the taxable period in question, was a resident alien of the United States and taxable as such. The facts found and the above determination are likewise dispositive of respondent's contention in Docket 8731, in which, relying on [43-1 USTC [*] 9464], he maintains that the corporation, Hard, A. G., SERVED A BUSINESS PURPOSE THROUGHOUT THE YEAR 1940 AND THAT SINCE PETITIONER RECEIVED THE SECURITIES FROM Bankers Trust Company as agent for Hard, A. G., petitioner is liable as a withholding agent for any income arising from such securities. The deficiency and penalties, as determined, are exact duplicates of those determined in Docket 8732. The fact is that Hard, A. G., at all times was used merely as a name in which *317 to carry petitioner's account, either in Switzerland or in the United States. It amounted to no more than a nominee of petitioner. We are concerned, under the pleadings, only with the period beginning May 10, 1940, when the petitioner took possession from Bankers Trust Company of the American securities previously held in the name of Hard, A. G. Whatever might have been the status of Hard, A. G., previous to that date, it seems too clear to require demonstration that thereafter it ceased to function in any capacity. Although he signed as an agent of Hard, A. G., in order to obtain the securities, this was a mere formality and not determinative of true ownership. The securities belonged to petitioner in his own right and he in no sense could be classified as a withholding agent for Hard, A. G. It might be pointed out that respondent's position in this Docket Number is entirely inconsistent with that maintained in Docket 8732, where he accepts petitioner's ownership of the stocks and taxes him accordingly. We conclude that respondent's contention that petitioner, during the taxable period, was acting as a withholding agent for Hard, A. G., is wholly without merit. Decisions will *318 be entered for the petitioner. Footnotes
1. SEC. 19.22-2. [Regulations 103] Definition. - A "nonresident alien individual" means an individual - (a) Whose residence is not within the United States; and (b) Who is not a citizen of the United States. The term includes a nonresident alien fiduciary. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances. [Internal Revenue Bulletin 1945-13-12081, Mimeograph 5883, dated June 27, 1945.] 4. Attention is invited to the last sentence of section 29.211-2, Regulations 111, which states that an alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of that section, in the absence of exceptional circumstances. The general rule adopted by the Bureau is that the type of visa issued is only one of the elements entering into the classification of an alien as a resident or nonresident. It is believed that there are many cases now which will come under the phrase "in the absence of exceptional circumstances" because of the fact that many visitors' permits, or temporary visas, were issued to aliens who desired merely to get out of a war-torn country under any conditions and under any passport or visa so long as they reached the shores of the United States. For example, while the vast majority of such aliens originally entered the United States on temporary permits, numerous extensions of such permits have been applied for and granted and a great number of applications have been made by such aliens to enter a third country in order to qualify for reentry into the United States on immigrants' visas, thus indicating an intention to become residents of the United States even though such immigrants' visas may not have been granted. On the other hand, the possession of an immigrant's visa by an alien, upon his initial entrance into the United States, is not conclusive of his classification as a resident of this country. Those aliens, therefore, who are properly classified as residents within the meaning of the regulations referred to above and under the general rules of law relating to what constitutes residence, should in every case be required to file returns on Form 1040, accounting for income from all sources, both within and without the United States, including capital gains. Furthermore, all nonresident aliens who are physically present in the United States and who have been engaged in trade or business within this country at any time during the taxable year should file complete returns on Form 1040B, accounting for their entire income from sources within this country, including capital gains. * * * * *
6. In connection with the examination of aliens, information should be obtained regarding (a) date of arrival in the United States; (b) whether members of the alien's family accompanied him; (c) type of visa or permit issued to him; (d) reasons for coming to the United States; (e) whether the alien registered under the Selective Service Act; (f) what funds, securities, or other personal property were brought into the United States by the alien or transferred to his account, or held for his benefit directly or indirectly through nominees or otherwise, prior to or after his arrival; (g) whether he performed personal services or engaged in any other business activities within the United States; (h) complete disclosure as to capital gains from dealings in securities or commedities; (i) whether he owns any real estate in the United States in his own name or in the name of a nominee; (j) if the alien entered the United States on a temporary permit, how many times it has been renewed; and (k) whether the alien has applied for or been granted an immigration visa or otherwise declared his desire or intention to reside in the United States.↩